# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA      :

          v.               :        23-CR-321-JEB

JAMES RAY EPPS, SR        :

## DEFENDANT'S POSITION WITH RESPECT TO SENTENCING

COMES NOW, the defendant, Jams Ray "Ray" Epps, SR, and in accordance with 18 U.S.C. § 3553(a) and § 6A1.2 of the United States Sentencing Guidelines respectfully submits to this Honorable Court his position with respect to sentencing. Mr. Epps agrees with probation's sentencing guidelines calculation of a range between 0 to 6 months. The defense concurs with the probation officer that a guidelines sentence of probation, accompanied by restitution, is sufficient and not greater than necessary both to effectuate the goals of sentencing and to avoid unwarranted sentencing disparities.

In further support of his position, Mr. Epps, through counsel, offers the following on information and belief:

## INTRODUCTION

Ray Epps understands the serious mistake he made when he joined others to attend the Stop the Steal Rally on January 6, 2021 and to encourage others to walk to the U.S. Capitol to continue to protest. At all times, Mr. Epps' intent was that the protest would be peaceful and would be done peacefully. Those were his words on January 5, and that was his intent on January 6. Mr. Epps became part of a group that crossed from wishful First Amendment-protected peaceful demonstration to a disaffected crowd that

crossed outside barriers in a way that was disorderly and disruptive to law enforcement officers. For that, this 62-year-old man has displayed remorse, accepted responsibility, and taken-on the brand of a convicted criminal that shames and embarrasses him and his family and will stain him for the rest of his life.

As the crowd's negative energy grew and violence toward police officers became apparent, Mr. Epps stepped back. He saw what the wishfully hoped-for peaceful protest had become, and he wanted no part of it. He told another protestor to relax, that's not what we are about. He walked between officers and protestors, encouraging the protestors to calm down and back down. He helped police officers. He gave medical aid to someone who had fallen. And he left. He didn't enter the Capitol. He didn't brag about what he had done. He went home to Arizona, shocked at what he had seen and been around.

Two days later, on January 8th, Mr. Epps learned that the FBI had posted photographs of persons of interest, with his being one of those photographs. He promptly self-surrendered to the FBI, calling and identifying himself as one of the persons depicted on the FBI bulletin. He gave his full contact information. He accurately spoke about what he saw and did that day. In the months that followed, he voluntarily sat for an interview with FBI agents and provided credible, reliable information. He was asked if he would speak with investigators with the House of Representatives Select Committee to Investigate the January 6th Attack of the U.S. Capitol (House Select Committee). He voluntarily agreed to that first interview in November 2021. He was then asked if he would publicly testify before the House Select Committee. Mr. Epps agreed, and did so on January 21, 2022.

From the outset, Mr. Epps has been remorseful and cooperative, attempting to mitigate the harm that occurred to the Nation on January 6th. For his actions, one would think he might be lauded. Instead, he has been attacked, defamed, and vilified – and after a decision that his actions at the Capitol did not warrant prosecution, a 180-degree turnaround by the government, with the threat of a request for prison time, after his name became dragged through the mud by right-wing political dramaturges who used the (correct) lack of prosecution as a social media and public cudgel against the Garland Justice Department.

For their own reasons, men like Donald Trump, Tucker Carlson, and others have falsely called out Mr. Epps as an FBI plant. They have publicly blamed Mr. Epps for what happened that day and for other persons being charged and convicted. Their lies have led to real threats against Mr. Epps, his wife, and his family. Social media has vilified them. Right-wing conspiracy theorists came by their home and their events business, sending a message with spent ammunition left on their property near their home, and leaving verbal threats of violence on their voicemail. The Epps sold their property. They fled their home and community in Queen Creek, Arizona, where they each had lived most of their lives, to move to another state as much off-the-grid as possible. They just want no conspiracy theorists to threaten – or harm – them.

Mr. Epps is a U.S. Marine, because once a Marine, always a Marine. The Corps' values remain his values. One of those values is that you take responsibility for your actions. Mr. Epps did so. His guidelines are a range of 0-6 months. He knows that the government may ask for jail time now, despite a previous determination by the FBI and the US Attorney's Office, as described below, that there was insufficient evidence to

charge him with offenses for his conduct on January 6th. Nonetheless, he accepts responsibility for his conduct. The government offered a plea agreement, and he accepted it.

The guidelines provide for zero jail time – probation is a Guidelines-compliant sentence. The probation department recommends that the Court impose a sentence of probation. And counsel does too. Mr. Epps has been punished. He is deterred. Jail time for him will not deter others. Probation will serve the § 3553 purposes of punishment, protect the community, and is sufficient but not greater than necessary given the history of Mr. Epps and his case.

**FACTUAL BACKGROUND**

A.  <u>Decision to Attend Stop the Steal Rally and Statements on January 5th</u>

After his son committed to traveling to DC to attend the Stop the Steal rally, Mr. Epps, encouraged by his wife Robyn who worried about their son's safety after viewing perceived scenes of violence in U.S. cities, decided to join his son rather than have his son attend alone. After their arrivals on January 4th, they woke up and spent the day of January 5th in Hopewell, Virginia as tourists, looking at property going back over a hundred years that had both familiar and American historical value. They returned to DC to their hotel on the night of January 5th. Mr. Epps was in his hotel room. His day was over.

Mr. Epps' son contact him and told him about a large crowd of Trump supporters that had gathered nearby at BLM Plaza and were arguing with the police. Mr. Epps joined his son to support him in that large crowd. As described in the Statement of the Offense ("SOO") at 3, ¶ 8, "In response to people proclaiming their anger at, and desire

to fight, Antifa and Black Lives Matter-affiliated groups and/or persons," Mr. Epps "interjected. He said, 'Tonight you can bring shame on us. That's not what it's about.' Another person challenged" Mr. Epps, citing the American Revolution.

Mr. Epps had been unsuccessful in talking others down. He then tried to find common ground. He said, "Tomorrow, we need to go in to the Capitol. In to the Capitol." *Id.* The SOO adds that Mr. Epps immediately followed with "Peacefully…" *Id.* More specifically, he stated, "Peacefully. Peacefully. Peacefully. We are freedom. We are peaceful. That's what it is about. It's not about hurting people." At that time, Mr. Epps thought that the Capitol would be open the next day, a weekday, to visitors.

In response to his call for peaceful protest, members of the crowd joined together to shout him down, chanting, "FED, FED, FED."[1] Social media broadcasts of the video of Mr. Epps' encouragement of peaceful demonstration were mocked. *See id.* (screenshot of video includes added overlay language: "f[--]k this old boomer idiot his generation failed us he can f[--]k right off he doesn't know shit, go").

B.  <u>Attendance at Stop the Steal Rally and January 6th Protest Outside the Capitol</u>

The next day, Mr. Epps went to President Trump's Stop the Steal Rally. Mr. Epps, a voter and supporter, wore his red "TRUMP" baseball cap. During the course of President Trump's statements, Mr. Epps told rally goers to "go to the Capitol" and pointed in the direction of the building. *Id.* at 4, ¶ 9. Mr. Epps did not encourage violence. It was common knowledge among the crowd that members would go to the Capitol after being at the rally. He advocated participation and protest, still thinking that the building would be open. Mr. Epps himself walked to the Capitol with others. He and others

---

[1] The defense will provide a public-source video as <u>Exhibit 101</u>.

5

reached a point where bicycle rack barricades and mesh fencing blocked further walking, with police officers on the other side. At that point, his mindset changed, as he realized that they were not permitted to enter the building. The "crowd grew increasingly agitated and confrontational." *Id.* at 5, ¶ 11. Another protestor named Ryan Samsel, later charged, was especially agitated and demonstrative. Mr. Epps went over to Mr. Samsel and told him to chill out, that the police were doing their jobs, and that everyone needed to be peaceful. *Id.* at 5, ¶ 11 n.1. He continued to advocate for peaceful protest. That individual and others nonetheless knocked the barriers down and surged forward.

Mr. Epps was one of those who followed behind then and again through a second set of barriers. In doing so, he engaged in disorderly and disruptive conduct. He made a mistake, one that he has and will have to live with. But he also had the wherewithal then to try to correct his mistake.

Mr. Epps ended up with a large group of protestors outside the West Plaza of the Capitol grounds, outside the Capitol building. The group of people was moving *en masse* toward the Capitol. Mr. Epps was within that crowd moving forward. Unrelated to him, an all-metal "Trump" sign started to be crowd surfed. *Id.* at 8, ¶ 16. Public source video that the government appears not to have and is not referenced in the SOO shows that the sign surfed directly over Mr. Epps, without his participation.[2] It ends up passing over him. During that time, rather than be hit by the sign, he "briefly placed both of his hands on the sign's fabric and/or frame." *Id.* at 9, ¶ 17. He also ended contact with the sign – doing so long before others moved it forward toward police officers. *Id.* Mr. Epps did not

---

[2] This video will be provided to the Court as <u>Exhibit 102</u>.

join in pushing the sign into officers, and he certainly did not intend to injure any officers with the sign.

The SOO correctly notes that "a group of rioters, including" Mr. Epps, went forward, leaning their bodies on each other. *Id.* at 10, ¶ 19. It was no rugby scrum as one might infer. Mr. Epps was not pushing forward as part of a unified effort. There was little choice but to move one's body forward. Indeed, the same public-source video of Exhibit 2 shows Mr. Epps trying to walk away from the Capitol against the stream of protestors.[3] Mr. Epps ended up making his way up to the front of the group, putting himself between the officers doing their jobs and the agitated crowd. He tried, unsuccessfully, to help the officers by calming and quieting protestors who were yelling in the face of law enforcement officers. He told the protestors, "We made our point" and tried to de-escalate angry crowd members.

Throughout his time on the restricted grounds, not even including his time trying to talk Mr. Samsel down, Mr. Epps "made at least five attempts to deescalate conflicts between other rioters and police officers and prevent rioters on the West Plaza from attacking police. *Id.* The defense will provide some of the videos that show Mr. Epps' de-escalation actions as Exhibits 103 *et seq*.

Mr. Epps never entered the Capitol itself. He turned away. Before he left the scene, he helped an injured person with medical care. Well after he had left, not still on the scene, he replied to a text message that a relative had sent him earlier in the day. As Mr. Epps has made clear in interview-after-interview, by texting, "I was in the front with a few others. I also orchestrated it," *see id.* at 11, ¶ 22, he meant that he was present and

---

[3] *See* Video Exhibit.

helped people got to the Capitol to protest on public land – something he later became embarrassed and sickened about when he saw what ended up happening. He did not, and did not mean, that he was an organizer of the disorderly and ultimately violent behavior of others. His goal was to be visible in protest of what he thought were election irregularities, not to riot or endanger officers or anyone inside the Capitol itself.

C.   Full Admission of Wrongdoing and Support of Government Investigation into His Own and Others' Actions on January 6th

After the events at the Capitol, the FBI posted on-line a number of photographs of "persons of interest" involved in the "Violence at the United States Capitol." One of the photographs was of Mr. Epps. On January 8th, Mr. Epps learned about the on-line posting. Upon viewing the posting, Mr. Epps "called the FBI tip line and identified himself as the person depicted" in one of the photographs. *Id.* at 12, ¶ 26. "In that same call," Mr. Epps "gave a lengthy consensual interview concerning his activities on Capitol grounds." *Id.* He admitted, and did not minimize, his actions. Subsequently, Mr. Epps, "participated in a consensual follow-up interview with FBI agents." Id. at 12, ¶ 27. He again admitted, and did not minimize, his actions.

The House Select Committee investigated the January 6th event. As explained below, Mr. Epps' name had been in the media. Committee investigators sought to interview Mr. Epps. He voluntarily agreed. Later, the House Select Committee sought to take Mr. Epps' formal sworn testimony on the record. Mr. Epps again consensually agreed. Throughout his four interviews with the FBI and the House Select Committee, Mr. Epps statements during the interviews were credible, reliable, and helpful.

**THE GOVERNMENT'S DECLINATION OF PROSECUTION DECISION**

After the Capitol was secured, the FBI and federal prosecutors started an investigation into criminal activity associated with the January 6th events at the Capitol. Mr. Epps was a target of the criminal investigation. The full scope of Mr. Epps' actions was known then, three years ago.

An FBI agent generated a four-page Capitol Riots Submission, which detailed the evidence against Mr. Epps. The memo discussed all the same evidence that is presented and relied upon in the SOO. The investigation included "violations of 18 U.S.C. § 1752 and 40 U.S.C. § 5104." A July 29, 2021 summary FBI memorandum explains, **"Investigation did not reveal sufficient evidence that Epps entered the U.S. Capitol on January 6, 2021, engaged in acts of violence or committed any other criminal violations**." And, consequently, a July 2021 FBI memorandum reports, "**The United States Attorney's Office in Washington, D.C. declined prosecution in this case.**" These documents are collectively attached as <u>Exhibit 1</u>.[4]

### INCITEMENT OF VIOLENCE TOWARD, THREATS, AND CREDIBLE DANGERS ENDURED BY RAY EPPS AND HIS WIFE

Meanwhile, right-wing conspiracy-generating political and media figures looked to create a scapegoat for January 6th. President Trump, Ted Cruz, Tucker Carlson, and others turned their spotlight on Ray Epps. Extrapolating from video that showed Mr. Epps attempting to quell the crowd, they accused him of being an FBI plant and instigator.

Within days of January 6th, many right-wing supporters of Donald Trump and conspiracy theorists had shifted from blaming antifa to blaming "the feds" for the

---

[4] Mr. Epps was unaware of the government's declination decision in 2021. He only became aware of it when the documents were disclosed to undersigned counsel in discovery.

violence at the Capitol, alleging, in essence, that the riot had been some kind of entrapment setup orchestrated by the government to ensnare Trump supporters. Over time, Mr. Epps emerged as the central villain of that conspiracy theory.

By the fall of 2021, a political and media maelstrom focused on Mr. Epps. In October 2021 a right-wing site called Revolver News published an article claiming, baselessly, that Mr. Epps had led a team of undercover federal agents that aimed to instigate the riot. Seized on by Steve Bannon and fueled by Tucker Carlson, Fox News, and the remainder of the right-wing echo chamber, the conspiracy theory blew up. Ray and Robyn Epps' lives would never be the same.



RAY EPPS: WE NEED TO GO INTO THE CAPITOL!

Fabulist U.S. Representatives Thomas Massie, Matt Gaetz, and Marjorie Taylor Greene raised the conspiracy theory about Mr. Epps in public statements and on the House floor. Senator Ted Cruz got into the act, naming Mr. Epps at a January 2022 Senate hearing:

> There are a lot of people who are understandably very concerned about
> Mr. Epps. … Mr. Epps has not been charged with anything. No one's
> explained why a person videoed urging people to go to the Capitol, a
> person whose conduct was so suspect the crowd believed he was a fed,
> would magically disappear from the list of the people the FBI was looking
> at.

The make-believe, blame-another theory was conspiracy catnip for former President

Trump, who speaking near Mr. Epps home at a rally in Arizona in January 2022,

specifically targeted Mr. Epps:



> Exactly how many of those present at the Capitol complex on January 6
> were FBI confidential informants, agents or otherwise, working directly or
> indirectly with an agency of the United States government. People want to
> hear this. How about the one guy, 'Go in, go in, get in there, everybody,'
> Epps. 'Get in there, go, go.' Nothing happens to him. What happened with
> him? Nothing happened.

President Trump's slurring of Mr. Epps lent fuel to a viral Twitter hashtag,

#WhoIsRayEpps.Credit, which was reported in the New York Times in July 2022.

That was the fall of 2021 and the winter of 2022. But to be clear, it has not ended. In September 2023, upon Mr. Epps agreeing to plea to the charge in this case, during a House Judiciary Hearing, Representative Massie accused Attorney General Garland of a cover-up of what led to January 6th, and Ray Epps' so-called involvement to, somehow, protect A.G. Garland. Around the same time, Tucker Carlson on his Twitter/X show, opined inaccurately and without basis that Mr. Epps is a "hero on the left" and "funded by the Democratic Party." His guest, former Capitol Police Chief Steven Sund—who has baselessly speculated that multiple federal agents were in the crowd during the insurrection—implied that Mr. Epps was a plant. Just tonight, as counsel is writing this memorandum, counsel's searches of top hits for "Ray Epps" on Twitter/X include:

> Cooperated!?!?! That's one way to put it, I'm guessing his sentence will be commuted for all his acts for the three letter agencies! SUCH TOTAL BS! DOJ Recommends JUST 6 MONTHS PRISON TIME for Ray Epps – Because He "Cooperated with the FBI and Congress!'..

And,

> Stevie Wonder can see that Ray Epps was a paid FBI informant/antagonist whose was to hype, and encourage the crowd to commit criminal acts.

And,

> What are Patriots going to do about Ray Epps?

It has not ended. And there is no end in sight.

### RAY AND ROBYN EPPS HAVE LIVED IN FEAR FOR TWO YEARS

The abuse that Ray and Robyn Epps have received as a result of his being honest with investigators is crushing. Anonymous persons emailed death threats. Trespassers on their property demanded "answers" about January 6th. People came up to Mr. Epps and warned him to sleep with one eye open. After Tucker Carlson amplified the lies spread by

Revolver News, Mr. Epps' wife discovered (and collected as evidence) shell casings on the ground near the bunkhouse of the farm-style wedding venue that they owned at the time in Arizona. Mr. Epps received a letter from someone claiming to have been brought into the country by the Mexican drug cartel and that cartel members had talked about killing Mr. Epps. A whole busload of people came by his property – interrupting a wedding ceremony – to shout threats at Mr. Epps.

Mr. Epps and his wife worried – they feared. They sold their property, including their business among it. They sold their property. They sold their house. They fled. They moved from Arizona, where each had lived most of their lives to another state. They now live in hiding in a trailer. Fear of demented extremists has no apparent end in sight so long as those who spread hate and lies about Mr. Epps don't speak loudly and publicly to correct the messaging they delivered.

The FBI has confirmed that Mr. Epps is correct to be afraid for his safety and that of his wife. After news reports about Mr. Epps' House Select Committee testimony, the FBI contacted a representative of Mr. Epps to advise that "credible threats" on his safety were made on the dark web. Private investigation also revealed threats on the dark web. In June 2023, Steven D'Antuono, who was the Assistant Director in Charge of the Washington Field Office from 2020 until November 2022, testified before the House Judiciary Committee about January 6th and Mr. Epps.

Q Are you aware of the Ray Epps story?

A Yep. I am very aware of that.

Q What can you tell us about your awareness of the Ray Epps situation?

A I feel awful for Mr. Epps because he has been wrongly accused of being a CHS [Confidential Human Source] and I think it's ruined his life.

Q Okay.

A So it's horrible.

Transcript, Committee on the Judiciary, U.S. House of Representatives (June 7, 2023) at

210.

### RAY EPPS FEELS AND DISPLAYS FULL REMORSE AND SHAME FOR HIS PRESENCE AND INVOLVEMENT IN THE JANUARY 6 RIOT

The record is replete with Mr. Epps' acceptance of responsibility for his actions.

Equally clear is the remorse and shame that he feels. The Court can view that in the

letters from his family and friends, who report how Mr. Epps has talked about and

responded to his behavior that day when together with the mob. The Court can also see it

in Mr. Epps' statements to the Court itself. Last fall, when asked about what he had to say

about his conduct, Mr. Epps stated:

> I would like everyone to know how ashamed I feel for being in
> Washington, D.C. on Jan. 6, 2021. I was gullible and fell for the lie that
> the election was stolen. I came to DC to join my son and to protest
> peacefully. I was at President Trump's rally. He was talking about the
> stolen election lie. Believing it, I went to the Capitol to protest, peacefully,
> and encouraged others to do the same.
>
> Many of the people at the Capitol were not peaceful. It was a disgrace. It
> was out of control. I was part of the crowd, went past where the bike
> barricades had been, I trespassed and engaged in disorderly or disruptive
> conduct in doing so. I didn't want violence. I didn't commit any, and I
> tried to calm other people down. I left, too late, but I'm glad that I did.
>
> I love this country, the Constitution and what it stands for. I believe in the
> rule of law and democratic process. What happened on January 6th didn't
> support the democratic process, it was against it. That wasn't my plan, but
> I was there. I will always regret my presence there and my actions in
> going beyond the barricades. I'm sorry for the whole thing – that officers
> got hurt, that democracy was damaged, and that there are many people
> who still don't realize how wrong that day was. I pleaded guilty because I
> am guilty of the crime. I'm deeply and sincerely sorry for it.

PSR at 10-11, ¶ 46.

> In a letter to this Court, Mr. Epps writes:
>
> I take full responsibility for knowingly trespassing on restricted grounds and as a result unlawfully engaging in disorderly conduct. By doing so, not only have I put my wife and family through an ongoing nightmare, but it has also left friends and hundreds of youths I taught and led with serious questions. I have let each of them as well as myself down. … I am regretful, remorseful, deeply sorry, and angry at myself ….

Exhibit 2. Mr. Epps' wife Robyn also writes this Court about Mr. Epps, the kind of man that he is, and his contrition for participating on January 6th. *See* Exhibit 3.

## THE STATUTORY PENALTIES

Mr. Epps will be convicted as to one count of disorderly or disruptive conduct in a restricted building or grounds, pursuant to 18 U.S.C. § 1752(a)(2), which is a Class A Misdemeanor. The charge does not have any mandatory prison time. It is probation eligible. It carries a maximum sentence of not more than one year of imprisonment and a fine. Supervised release is not mandatory. The maximum term of supervised release is one year.

### A.  Special Assessment, Restitution, and Fines

The Court should impose a special assessment in the amount of $25 and restitution, as part of the plea agreement, in the amount of $500. Given Mr. Epps' financial situation, the Court should follow the recommendation of the probation department and not impose a fine.

## THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

With one small exception, the relevant guidelines are not in dispute. The government established the guidelines when it crafted the charge that Mr. Epps was permitted to plead guilty to and set the guidelines that he had to agree with. Mr. Epps'

base offense level is 10. There are no enhancements. The offense level is reduced by 2 to account for Mr. Epps' acceptance of responsibility for a total offense level of 8. The sole difference between the PSR and the defense is that counsel believes that Mr. Epps meets the criteria of Guideline § 4C1.1(a), which would reduce his base offense level to 6. The defense disagrees with any finding that Mr. Epps used violence or credible threats of violence in connection with this disorderly conduct offense. The Court need not necessarily resolve this question as it does not affect the guidelines and the Court is free to impose its own sentence irrespective of the guidelines.

Mr. Epps has never before been arrested or charged with a crime. He therefore is in criminal history category 1. He has zero criminal history points.

Mr. Epps' guidelines range, whether at offense level 8 or 6, is 0 to 6 months of imprisonment. A probation sentence of one-year is guidelines-compliant. This Court has the authority and should depart downward and place Mr. Epps, who has been flawless on his pretrial release and more generally, in the three years since his offense on January 6, 2023, to a shorter term of probation than one year.

The probation officer recommends probation. The defense concurs. A jail sentence is excessive, serves no valid purpose, and is greater than necessary.

I.      **SENTENCING FACTORS UNDER 18 U.S.C. S 3553(A)**

      A.      <u>Ray Epps Life Has Been One of Service and Following the Law.</u>



This Court has the benefit of a detailed presentence investigation report, as well as a number of letters, which are attached cumulatively as <u>Exhibit 4</u>. Counsel will not regurgitate here the information that the Court has in other forms. In short, Mr. Epps' entire life has been about giving to others – his country in his service as a Marine, his family, his neighbors, and his church. He gives selflessly of himself. And to him, his wife's needs are more important than his own.

B.  <u>Nature and Circumstances of the Offense</u>

Mr. Epps admitted to the commission of disorderly or disruptive conduct in a restrictive area because he is guilty of the offense. He fully accepts his responsibility.

Counsel nonetheless believes that the government had it right three years in 2021 when**, based upon the exact same evidence**, it declined to prosecute Mr. Epps for any offenses associated with January 6th. Mr. Epps was one of many who trespassed outside the Capitol building. Through the exercise of prosecutorial discretion, most of those persons will never be charged. As for additional facts that raise Mr. Epps' conduct beyond trespass, they exist to the degree of permitting a factual basis for the offense but are minimal. The Class A misdemeanor under § 1752(a)(2) very closely resembles a petty offense under 40 U.S.C. § 5104(d) ("engage in disorderly or disruptive conduct, at any place in the Grounds or in any of the Capitol Buildings with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress, or the orderly conduct in that building of a hearing before, or any deliberations of, a committee of Congress or either House of Congress."). The statutory difference is the addition of "restricted grounds." To counsel, that difference is fairly inconsequential in terms of culpability, and if criminally charged, this could and should have been a petty misdemeanor. The government disagreed. Either way, this particular § 1752(a)(2) offense tends toward the less serious end of misdemeanors and guidelines ranges.

C.  <u>The Need for the Sentence to Reflect the Seriousness of the Offense and Promote Respect for the Law</u>

A sentence of probation – within the Guidelines, recommended by Probation, and consistent with other sentences in cases with more aggravation and far less mitigation than this one – will reflect the seriousness of the offense and promotion respect for the

law. While counsel previously requested that Mr. Epps is permitted to possess firearms pretrial and reiterates that request here while on probation, the loss of what is otherwise a constitutional right as a condition of probation would further promote respect for the law.

### D.   The Need for the Sentence to Afford Adequate Deterrence

A sentence of probation will afford both adequate specific and general deterrence. As for specific deterrence, being under supervision will deter Mr. Epps from even coming close to the line of any criminal conduct. No one could say with a straight face that Mr. Epps will ever act disorderly or commit a crime again after his experiences here, as well as given his lifetime of lawful behavior. A carceral sentence provides no additional benefit there. As for general deterrence, others will see that Mr. Epps was prosecuted and convicted, potentially having a firearms restriction and having had other collateral consequences of his conviction. Otherwise-law-abiding persons, like Mr. Epps was for the first 60 years of his life, will know from the bitter lesson that he has learned that they need to avoid situations that Mr. Epps placed himself in and to remove themselves earlier than he did.

### E.   The Sentencing Guidelines

The U.S. Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), and its progeny, require district courts to consider both the guidelines range and all of the factors contained in 18 U.S.C. § 3553(a) when calculating a criminal defendant's ultimate sentence. Following a consideration of the guideline range along with the § 3553(a) factors in relation to the facts of the case, the district court shall impose a sentence *sufficient, but not greater than necessary*, to comply with the intent of § 3553(a). *See Gall v. United States*, 552 U.S. 38, 52 (2007) (quoting *Koon v. United*

*States*, 518 U.S. 81, 98 (1996)) ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue").

    F.   <u>The Need for the Sentence to Avoid Unwarranted Sentencing Disparities</u>

    Section 3553(a)(6) directs the court "to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." A probationary sentence is consistent with other sentences in January 6 cases in this jurisdiction for violations of § 1752(a)(2). Three illustrative examples include:

- *U.S. v. Stephen Aryes*, No. 21-cr-156-JDB: After an indictment for obstruction under § 1512 and three misdemeanors, Mr. Ayres was convicted, upon entry of a guilty plea, to one count in violation of 18 U.S.C. § 1752(a)(2). In seeking a 6 month sentence of incarceration, the government reasoned that Mr. Aryes had (1) made statements on Facebook prior to January 6 that members of Congress, Chief Justice John Roberts, and Vice President Michael Pence had committed treason and were now put on notice by "We The People"; (2) entered and stayed inside the Capitol for about 90 minutes; (3) posted to Facebook images of rioters storming the Capitol; and (4) agreed with another person, in a YouTube video posted after the attack, that "The purpose of today was to expose Pence as a traitor" and "the American people are not going to let this slide" – all words that incited violence. Judge Bates sentenced him to twenty-four (24) months of probation. Mr. Epps, who entered a pre-indictment

resolution, did not enter the Capitol and did not crow about his actions afterward, should not receive a greater sentence than Mr. Aryes.

- *U.S. v. Felipe Marquez*, No. 21-cr-136-RC: After an indictment for five counts, including obstruction under § 1512 and four misdemeanors, Mr. Marquez was convicted, upon entry of a guilty plea, to one count in violation of 18 U.S.C. § 1752(a)(2). In seeking a 4-month sentence of incarceration, the government reasoned that Mr. Marquez had encouraged others to climb the wall into the Capitol, entered the Capitol himself, entered Senator Merkley's hideaway office for about 10 minutes, joined in damage to the Senator's office, admitted to the breaking of government property, posted on public social media after the event to celebrate his actions. Pending release in the case, Mr. Marquez maintained his firearms with his roommate and was stopped by a Florida police officer at a mall in possession of a firearm. Judge Contreras imposed a sentence of 18 months of probation, with conditions, including 3 months of home detention. Mr. Epps, who entered a pre-indictment resolution, did not enter the Capitol did not crow about his actions afterward, did not possess firearms in violation of his conditions of release should receive a probationary sentence without the requirement of home detention.

- *U.S. v. Steven Billingsley*, No. 21-cr-519-TFH: After a misdemeanor information, Mr. Marquez was convicted, upon entry of a guilty plea, to one count in violation of 18 U.S.C. § 1752(a)(2). In seeking a 6-month sentence of incarceration, the government reasoned that Mr. Billingsley (1) recorded and

posted to Facebook a series of first-person videos and audio depicting him in an array of disruptive conduct on Capitol grounds; (2) taunted, yelled at, and ignored directions from police officers; (3) encouraged and assisted other rioters in breaching the Capitol grounds, including by unhooking a metal barricade and letting himself and other rioters through; (4) engaged in violent rhetoric including posting on Facebook video about "taking the House" and physically hurting and hanging by a tree Speaker Pelosi and Senator Schumer; and (5) expressed no remorse for his actions. Judge Hogan imposed a sentence of 24 months of probation, with 60 hours of community service.  Mr. Epps, who followed the directions and supported police officers, did not physically remove barriers to let other rioters through engaged in no violent rhetoric, and, importantly, has expressed deep remorse, should receive a probationary sentence, although Mr. Epps should be for a shorter term.[5]

In addition to specific case examples, in avoiding disparate sentences, the Court has the benefit of Judiciary Sentencing Information provided by the probation officer. *See*

---

[5] A recent example of a case in which a § 1752(a)(2) was the most serious charge of conviction is *U.S. v. Tyler Tew*, No. 22-cr-27-RMM. There, because Mr. Tew "was not willing to accept or admit a factual basis drafted by the Government given what he knew about factual admissions forced on other defendants through government crafted plea agreements," Mr. Tew pleaded guilty, without a plea agreement, to all four counts of the information, including charges under §§ 1752(a)(1) and (a)(2), as well as two petty misdemeanors. The criminal complaint reflects allegations that Mr. Tew deleted evidence from his cell phone before his arrest. The defense sentencing memo acknowledges that Mr. Tew entered the Capitol and chanted directly at police officers that they should join the protestors while videotaping the entire time. There is no claim of remorse in the sentencing memo. The government's sentencing memo is not on ECF, but the government's sentencing chart reflects that the government sought a sentence of 3 months of incarceration. Judge Meriweather imposed a probationary sentence of 24 months. Mr. Epps, who greatly assisted police officers, did not enter the Capitol, and has expressed deep remorse, should receive a (shorter) probationary sentence.

PSR at 26, ¶ 153. Setting aside cooperators, almost half of all defendants sentenced pursuant to the same guideline as Mr. Epps, with a criminal history category of 8, were sentenced to probationary sentences (42%). Incarceration sentences for Offense Level 6 defendants, if Mr. Epps were to receive the new adjustment, are so infrequent that meaningful data could not even be generated. And of course, these figures militating in favor of a probationary sentence are for defendants who did not provide substantial assistance. While not pursuant to a formal § 5K1.1 departure, **Mr. Epps did provide substantial assistance** – and he did, horrifically, reaped the harms associated with doing so that militate in favor of mitigated sentences – by his cooperation with the FBI and the House Select Committee.[6]

## CONCLUSION

For the reasons above, on behalf of Ray Epps, undersigned counsel requests that the Court impose a sentence of 6 months of probation with conditions that may but do not necessarily include a firearms restriction, restitution of $500, and the mandatory $25 special assessment. Counsel reserves the right to reply to the government's sentencing memorandum and to make additional requests at the time of the sentencing hearing.

Respectfully submitted,

---

[6] Additionally, in avoiding unwarranted sentencing disparities, counsel thinks the Court should consider sentences under 40 U.S.C. § 5104. As noted above, the elements of the offense to which Mr. Epps pleaded guilty are substantially similar to § 5104(d) ("engage in disorderly or disruptive conduct, at any place in the Grounds or in any of the Capitol Buildings with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress, or the orderly conduct in that building of a hearing before, or any deliberations of, a committee of Congress or either House of Congress."). Cases in which defendants have been sentenced under § 5104 have regularly resulted in either straight probation or probation with home confinement sentences.

RAY EPPS, SR.
By Counsel


_____/s/_____
Edward J. Ungvarsky, Esquire
DC Bar No. 45934
Ungvarsky Law, P.L.L.C.
421 King Street, Suite 505
Alexandria, Virginia 22314
Desk: 571/207-9710
Cell: 202/409-2084
Fax: 571/777-9933
ed@ungvarskylaw.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 2nd day of January 2024, I electronically filed a true

copy of the foregoing motion with the Clerk of Court using the CM/ECF system, which

will send a notification of such filing (NEF) to all parties.

_____/s/_____
Edward J. Ungvarsky, Esquire
DC Bar No. 45934
Ungvarsky Law, P.L.L.C.
421 King Street, Suite 505
Alexandria, Virginia 22314
Desk: 571/207-9710
Cell: 202/409-2084
Fax: 571/777-9933
ed@ungvarskylaw.com