```
1                    IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA
2

3      United States of America,      ) Criminal Action
                                      ) No. 23-cr-321
4                      Plaintiff,     )
                                      ) SENTENCING HEARING
5      vs.                            )
                                      ) Washington, DC
6      James Ray Epps,                ) January 9, 2024
                                      ) Time:  10:00 a.m.
7                      Defendant.     )
       _____
8
                      TRANSCRIPT OF SENTENCING HEARING
9                            HELD BEFORE
                   THE HONORABLE JUDGE JAMES EMANUEL BOASBERG
10                      UNITED STATES DISTRICT JUDGE

11     _____

                       A P P E A R A N C E S
12

13     For Plaintiff:     Michael Matthew Gordon
                          DOJ-USAO
14                        400 North Tampa Street
                          Suite 3200
15                        Tampa, FL  33602

16     For Defendant:     Edward John Ungvarsky (By Zoom)
                          Ungvarsky Law, PLLC
17                        421 King Street
                          Suite 505
18                        Alexandria, VA  22314

       _____
19
       Court Reporter:         Janice E. Dickman, RMR, CRR, CRC
20                             Official Court Reporter
                               United States Courthouse, Room 6523
21                             333 Constitution Avenue, NW
                               Washington, DC  20001
22                             202-354-3267

23

24

25
```

```
1        *  *  *  *  *  *  *P R O C E E D I N G S*  *  *  *  *  *  *
```

2          THE COURTROOM DEPUTY:  Good morning, everyone.  We're

3    here today for a sentencing in criminal matter 23-321, the

4    *United States of America versus James Ray Epps, Sr.*

5          Beginning with counsel for the government, please

6    approach the lectern and state your name for the record.

7          MR. GORDON:  Good morning, Your Honor.  Mike Gordon

8    for the United States.

9          THE COURT:  Good morning.

10          THE COURTROOM DEPUTY:  And defense.

11          MR. UNGVARSKY:  Good morning.  Edward Ungvarsky on

12    behalf of Mr. Epps.  Mr. Epps and I are both present by video.

13          THE COURT:  Good morning.  Mr. Epps, can you see and

14    hear me okay?

15          THE DEFENDANT:  Yes, sir.

16          MR. UNGVARSKY:  Judge, the one thing is, I mean, we

17    have a shot of the entire courtroom.  So, I mean, I can see a

18    person at the bench in a black robe.

19          THE COURT:  It's me.

20          MR. UNGVARSKY:  That's much better.

21          THE COURT:  I can assure you, it's me.

22          MR. UNGVARSKY:  Understand.  We can't really see you,

23    such as -- can't see your face, your expressions and all that.

24          Now I can.

25          THE COURT:  Okay.

```
 1                THE COURTROOM DEPUTY:  I can Zoom on everyone, or I

 2     can slowly Zoom in on the judge, whichever you prefer, Counsel.

 3                MR. UNGVARSKY:  I think the judge.

 4                THE COURTROOM DEPUTY:  Okay.

 5                THE COURT:  The volume is a little high.

 6                THE COURTROOM DEPUTY:  Yes.  It's loud because we

 7     have a hearing-impaired person in the courtroom.

 8                THE COURT:  Fine.

 9                THE COURTROOM DEPUTY:  Can I give him headphones?

10                THE COURT:  Fine.

11                Okay.  We're here today for sentencing.  I've

12     reviewed the -- I'm sorry, the presentence report author, let

13     me have you enter your appearance.

14                THE PROBATION OFFICER:  Good morning, Your Honor.

15     Aidee Gavito.  I'm covering for the officer who authored the

16     presentence report, she is an officer out of California.

17                THE COURT:  Thank you so much for being here.

18                I've reviewed the presentence report and

19     recommendation.  I've reviewed the memorandum submitted by the

20     government.  I've reviewed the memorandum and the exhibits

21     submitted by the defense.  I reviewed the exhibits, also, the

22     video exhibits submitted by the defense.

23                Anything else preliminary before we proceed,

24     Mr. Gordon?

25                MR. GORDON:  No, Your Honor.  Thank you.
```

```
 1              THE COURT:  Mr. Ungvarsky?

 2              MR. UNGVARSKY:  Your Honor, did you review the

 3     defense response to the government's memo?

 4              THE COURT:  I'm sorry, I should have mentioned that.

 5     Yes, I did.  Thank you.

 6              MR. UNGVARSKY:  Thank you.  Nothing else, Your Honor.

 7              THE COURT:  Okay.  I'll hear from the government.

 8              MR. GORDON:  Thank you, Your Honor.  You want us to

 9     move straight to allocution?

10              THE COURT:  Yes.

11              MR. GORDON:  Okay.  I have a PowerPoint presentation

12     that one of my paralegals, Elizabeth Hayman -- she's on the

13     Zoom.  What it contains is --

14              THE COURT:  Sorry.  Just one second.

15              (Pause.)

16              THE COURT:  I'm sorry, Mr. Gordon.  Go ahead.

17              MR. GORDON:  The PowerPoint presentation includes

18     some videos referenced in the government's sentencing

19     memorandum.  Actually, the videos themselves, you can view

20     them.  One in particular has been treated with highlights and

21     circles so it's easier to track the defendant.  So when it

22     comes time to get to the, sort of, real substance of what the

23     defendant did, I would like to play those for Your Honor.  It's

24     going to take -- just to give you sort of an expectation of

25     where we're going.  Going through all of those will probably
```

1      take about 20 minutes, when I get to that.

2                 THE COURT:  Okay.

3                 MR. GORDON:  We hope that will work.  I have Zoom, so

4      everybody can see them.

5                 Your Honor, Ray Epps has been unfairly scapegoated,

6      but he is not a victim.  He was not a secret agent of the

7      government on January 6th, trying to trick unwitting Trump

8      supporters into committing federal crimes.  That's not what

9      happened.  But he is not innocent, either.

10                 Make no mistake, Ray Epps did not start the riot or

11      cause it, but he did make it much worse.  He committed multiple

12      crimes on that day.  He's only pled to one because that's the

13      plea offer we made with him.  But he committed multiple crimes

14      that day.  He was convinced that the election had been stolen

15      and that the steal needed to be stopped.

16                 He wanted a mass of people to descend on the Capitol,

17      to go inside the Capitol, and in their presence, intimidate

18      congress into not certifying the election.  And he did

19      everything he did to make that happen the night before.  On

20      January 5th he went down to a rally and he tried to persuade

21      people that tomorrow we need to go into the Capitol, and even

22      though he said, "I'll probably get arrested for saying this."

23                 The next day, along with many members of the Proud

24      Boys, he left the Ellipse, long before President Trump had

25      finished speaking, and began that march on the Capitol.  He was

1     determined to be at the front of the mob.  When others broke

2     down the very first police barricade, he eagerly ran through it

3     and raced to stay at the front.  When others broke down the

4     second barricade, injuring an officer in the process, he

5     eagerly ran through again to stay at the front.  He contributed

6     to multiple instances of violence against police officers.

7            He does not deserve the attention and threats he has

8     received.  Those are mitigating.  But he does deserve to go to

9     jail for what he did on January 6th.

10           This is unquestionably a unique and complicated case.

11    And I want Your Honor to know up front that I am not -- that I

12    am asking you for the sentence that I believe is the

13    appropriate one, not trying to ask high and hope you'll go

14    lower.

15           He didn't start the riot; he made it worse.  Beyond

16    the mitigation of the conspiracy theory he's been victimized

17    by, he is on video on at least five occasions directly trying

18    to tamp down other instances of violence, trying to assert

19    himself between rioters who were getting aggressive with police

20    officers and those police.  He's on video multiple times

21    telling rioters, "Hey, they're just trying to do their job.

22    We've made our point.  Nobody needs to get hurt."  I'm not

23    aware of any other case where we have a defendant doing that.

24    That's mitigating.

25           Just two days after the riot he called the FBI

1    himself and identified himself as the person in photograph No.

2    16 on the FBI's information wanted poster and then he gave a

3    20-minute voluntary interview in which he confessed.  That's

4    mitigating.

5          He also voluntarily cooperated with Congress's

6    investigation, so that -- you know, engaging in both a

7    preliminary interview and a lengthy transcribed one to members

8    of Congress.  And his life has been destroyed by conspiracy

9    theorists eager to blame the government for the violence that

10   happened on January 6th.

11         So all of that goes into the stew that Your Honor has

12   to consider to arrive at the appropriate sentence.  I

13   understand the defense has asked for probation.  But generally

14   in these cases probation has been reserved for the most

15   minimally culpable people; those who have a misdemeanor

16   parading plea and if they entered the Capitol and did so for an

17   extraordinarily brief period of time and have no other

18   aggravators.  That's not Mr. Epps.

19         His behavior generally consists of six -- or, his key

20   behavior, his relevant conduct consists of six key incidents.

21   I want to go through the video and the photographs of each of

22   those now, using the PowerPoint that we have here.

23         So I'm going to begin with, Elizabeth, if you can

24   pull up slide No. 3.

25         So this, that we're going to play in just a moment,

```
1    the first instance I want to talk about is the attempts

2    Mr. Epps made to build the size of the mob deliberately in

3    advance.  So the video you're about to see is live-streamed

4    video recorded by another January 6th defendant named Anthime

5    Gionet, or "Baked Alaska" is the name he uses online, on the

6    left side of the screen, which you'll see scrolling are real

7    time comments written by unknown other people.  I don't think

8    you need to read any of those.

9            Mr. Gionet recorded himself going down to Black Lives

10   Matter Plaza on the night of January 5th as this group aired

11   their grievances to each other.  And different people in that

12   group had different arguments.  At the beginning of this clip

13   in the video, what you're going to see is a group of

14   Metropolitan Police officers start to have some sort of

15   confrontation with another person in the crowd.  It's unclear

16   what exactly it is.  And then the crowds are turning its

17   attention on the MPD officers and that's when Mr. Epps steps in

18   to talk to the rest of the crowd, and that's what you're going

19   to see.  It's about a two-minute video in total.

20           So, Elizabeth, if you could play that now.

21           (Video played.)

22           So what I'm noticing is that the audio is clear.  The

23   video is jumpy when played through the Zoom application so we

24   can view it.  So with Mr. Ungvarsky's consent, when we get to

25   later videos where we've done the treatment where the
```

1   highlighting is on Mr. Epps, I'm going to ask to play those

2   directly from here.  And Mr. Ungvarsky has copies of them

3   himself for clarity.

4         So the key here is that Mr. Epps is saying, "Tomorrow

5   we need to go into the Capitol."  And he preferences with it,

6   "I don't want to say it," or, "I don't like to say it because

7   I'll get arrested."  So it's an acknowledgment that he already

8   understands or believes that what he's about to advocate for is

9   illegal.  Whether it's right or wrong is a different question.

10        But he knows the wrongness of this and he's

11   advocating for it.  And the person talking to him says, "Well,

12   then don't say it."  And Epps' response is, "Well, I'll say

13   it."  He leaps into that breach himself.  And adding

14   "peacefully" on to the end of his urgings doesn't cure that.

15   He viewed this as a 1776 moment.  Only Congress or the bridge.

16   And he and his fellow agitators, they were the Revolutionary

17   War heroes and they were headed to the Capitol to stop that

18   tyranny.

19        And then the next day, at the rally, he does similar

20   things.  There are many instances on video.  I'm only going to

21   play one, where Mr. Epps is talking to anyone who will listen

22   and saying, "After this we've got to go to the Capitol."

23        So, Elizabeth, if you can play slide No. 4, please.

24        (Video played.)

25        Just one example.  But, look, this is still First

1    Amendment protected speech at this point.  This is not rising

2    to the level of incitement.  I'm not suggesting that it does.

3    But he is trying to build up what became a mob of thousands.

4    He knew that in advance.  I'm not saying he didn't.  That's a

5    contributing, aggravating factor, even though it's not criminal

6    itself.

7              Moving on to the first breach.

8              Elizabeth, if you can pull up slide No. 6, but don't

9    play it yet, please.

10             So this is the scene just before the first breach.

11   This mob has arrived at the outer perimeter of a restricted

12   area, where there's some bike rack barricades at the end of

13   this Pennsylvania Avenue approach.  That first level of

14   barricades, or first layer of barricades is unguarded by

15   police.  There's no person there.

16             Just behind it, call it 50 feet away, you can see the

17   second layer of barricades with officers standing behind that.

18   There's about five officers in total.  You see three on the

19   screen at the moment, but there's about five officers standing

20   there.  This crowd only reached this point about three minutes

21   earlier.  So they've been sort of stymied at this first layer

22   of barricades for about three minutes.  And you can see

23   Mr. Epps is right at the front.

24             The key here, at this moment, is any arguments that

25   he thought they were allowed to be in the Capitol on January

1    6th has to be out the window at this moment.  He has gotten

2    there, there are barricades, people are stopped, nobody is

3    walking through it, and he can see, just behind it, uniformed

4    police officers standing in a higher plain with clear Area

5    Closed signs.  At this point it is abundantly obvious no

6    further progress is lawful.

7           However, this is what happens:  Mr. Epps works his

8    way to the front the crowd, is there for a couple minutes and

9    then other people -- not him, he doesn't touch a barricade --

10   but other people bust through that first layer of barricades

11   and they run up to the second layer.  So he didn't touch

12   anything himself, but he was all too eager to take advantage of

13   those who did.

14          So, Elizabeth, if you can play this slide, please.

15          (Video played.)

16          Mr. Epps doesn't turn back at this point, he surges

17   forward.

18          Elizabeth if you can go to slide 8, please.

19          Because of how jumpy this video was, you didn't see

20   the first person to reach the second layer of barricades was

21   the man in the backwards Make-America-Great-Again hat, centered

22   in the photograph.  That's Government Exhibit 4.  That man is a

23   man named Ryan Samsel.  And this image, captured from another

24   rioter's video, is the one, essentially, that made Mr. Epps

25   famous.  This is him whispering to Ryan Samsel, just before

1    Ryan Samsel and others broke down that second layer of

2    barricades.

3             For this video I would like to play it from the

4    podium.  Ms. Bell Norwood, if I can.

5             THE COURTROOM DEPUTY:  Sure.

6             MR. GORDON:  The group is at this second barricade

7    for seconds.  Again, Mr. Epps doesn't touch the barricade

8    himself, but rushes forward as soon as possible.  He has worked

9    his way to the very front.

10            When you watch the video I'm about to show, you'll

11   see that there are approximately five officers.  And on our

12   right side -- would have been the police's left -- is a female

13   officer, United States Capitol Police Officer Caroline Edwards.

14   You'll see that when the crowd -- that's right there, rushes

15   through the barricade, they knock her back and she hits her

16   head on the stairs behind her.  She sustained a concussion.

17            She also sustained injuries -- I have pictures you'll

18   see -- to her eye and to the back of her leg from that fall.

19   Caroline Edwards got up and kept defending the Capitol that

20   day.  But this breach that Epps was at the front of in fact

21   injured an officer at that moment.

22            But more importantly, this is when the floodgates

23   opened.  This is when a riot could have been something small,

24   that maybe the assembled police could have dealt with, became a

25   flood of thousands they could not.  And here, while Epps does

1   not break down that barricade himself, the fact that he was in

2   front, the fact that he ran forward, the fact that he projects

3   authority, that he is a man who is 6-foot-4 -- and while he may

4   205 now, he weighed more than that then.  He's a large man.

5   He's wearing desert camouflage sleeves.  He's a man who looks

6   like, to others, as a man of action, someone to follow.  He is

7   up front, busting through and running through that.  So any

8   cues other people might have taken from their surroundings, he

9   was providing loud and clear.

10          Ryan Samsel has been charged with multiple crimes.

11  He went over to Carol Edwards and tried to render some aid to

12  her.  Mr. Epps, he ran forward.  So for all talk about being

13  concerned about violence of other officers, as soon as the

14  breach of the manned barricade happened, he made a beeline

15  towards the Capitol.

16          He raced forward, others followed.

17          (Video played.)

18          MR. UNGVARSKY:  I don't know if there was a video

19  playing.  I heard sound.

20          MR. GORDON:  Mr. Ungvarsky, I don't think you're

21  going to be able to see.  It's a video of the breach, but it's

22  playing on the Zoom screens.  I don't believe it's viewable.

23          THE COURTROOM DEPUTY:  I tried to do -- do you see

24  anything at all?  Do you see the four screens?

25          MR. UNGVARSKY:  I mean, I see four screens.

```
 1              THE COURTROOM DEPUTY:  Do you see a lady with a
 2   backpack, a peach backpack?  That's the video.  Do you see it?
 3              MR. UNGVARSKY:  I don't see it.
 4              THE COURTROOM DEPUTY:  If I take it out of the four
 5   screens --
 6              MR. UNGVARSKY:  Just to be clear, when I can't see
 7   it, it means Mr. Epps wouldn't be able to see it.
 8              THE COURT:  You can leave it in the four screens.
 9              Okay.  Go ahead, Mr. Gordon.
10              (Video played.)
11              MR. GORDON:  Ms. Bell Norwood, can we switch back to
12   Ms. Hayman's presentation?
13              Your Honor, that video doesn't show Mr. Epps because
14   he's just off screen, to the right.  There were photographs
15   that were in the government's sentencing memo.
16              And, Ms. Hayman, if you show -- the next slides
17   capture where Mr. Epps was right when those barricades went
18   down, the crowd surged forward.  So, Ms. Hayman, if you show
19   10, then 11.
20              This is 10, at the moment when the barricades are
21   going down.  You can see Mr. Epps is right at the very front,
22   feet away, watching this happen.  If he thought what happened
23   going forward was lawful or okay or a peaceful protest or he
24   was going to somehow be able to keep it peaceful, which is
25   something he's expressed on other occasions, that I wanted to
```

1    be at the front because I thought I could stop it from being

2    violent.  Again, that has to be out the window.  At this point

3    he is making a conscious decision to be part of a violent mob

4    that is assaulting and overrunning police, and to lead the way

5    for others to follow behind him.

6            We move to the next photograph, please.

7            This shows, second later, as the crowd goes surging

8    over, climbing over those barricades.

9            If we could move to Government's Slide 13.  That

10   brings us to the next major incident of the story of Mr. Epps'

11   day on January 6.  That's what I'm referring to as the sign

12   push.  It's been called other things by other people.  This

13   sign, it's enormous.  You can tell by this photograph.  One

14   person -- probably looks like it's 10 to 15 people standing

15   shoulder to shoulder wide.  The sign itself is made of fabric,

16   but the frame is heavy and it's metal.

17           There's four casters on it, four heavy metal wheels,

18   each one described as being about the sides of a person's head.

19   This had been wheeled all the way from the Ellipse, down either

20   Constitution or Independence Avenue, then brought to the crowd,

21   hoisted overhead and kind of crowd surfed, passed overhead from

22   the south end of the west plaza towards the scaffolding in the

23   center, which is where Mr. Epps was.

24           When it got to Mr. Epps, he put his hands up and as

25   the sign is being turned towards the police officers, he is

1    reaching for it.  And he is reaching for it even after it

2    passes over his head and beyond his grasp.  Now, reasonable

3    people can look at the video of this sign at the moment when

4    Mr. Epps' hands are up and disagree about whether his hands are

5    on the sign, inches from it, whether one hand is touching it,

6    whether both hands are.  Reasonable people can and have looked

7    at that and disagreed about exactly whether he's touching it or

8    not.

9          What cannot be disputed, however, is not only that he

10   is reaching for it, but the suggestion that he's only reaching

11   for it to protect his own head is undermined by the fact that

12   after it passes, sort of, his head space, you can see that he

13   is continuing to reach for it.  And there is a crucial

14   distinction -- it doesn't happen for long, it's a second -- but

15   if all you're doing is trying to protect yourself, there would

16   be no reason to want to touch it once you can't.

17         But it's moving toward the police.  Mr. Epps is still

18   reaching forward.  And when it goes beyond his grasp, he points

19   forward, twice.  And now in the still shot, you can argue he's

20   pointed up, and the defense has argued that.  But in the slow

21   motion treatment of the video I'm about to show you now, he's

22   pointing forward, in the direction of the police.

23         Is it possible he's saying, "Don't push it that way,

24   there are police there"?  Sure.  We don't know.  We don't have

25   audio.  I don't know what he's saying.  But circumstantially,

1    taking that together, reaching out for it, continuing to reach

2    for it, and all these other times when he has been eager to

3    take advantage of others doing, sort of, the aggressive work of

4    breaking down the barricade or breaching the police line, with

5    him eagerly following, he contributed to that sign being pushed

6    into the police.

7            So, Ms. Bell Norwood, I'm going to show three videos,

8    this time from the government's podium.

9            Basically what we have, Your Honor, is two angles

10   that I'm going to play for you and then a composite that sort

11   of links them up together so that you can see that.

12           Ms. Bell Norwood, can we switch to the podium,

13   please.

14           (Video played.)

15           I'm sorry, Your Honor.  I did the composite one

16   first, which I did not mean to do.

17           (Video played.)

18           You saw all the things I described in my video, as

19   well as that -- what I've described as a rugby scrum push that

20   happened afterward, in the wake of the sign and the police.

21           That would be the officer in the white, sort of,

22   commander or superior shirt, pulls out a large canister of

23   pepper spray, starts spraying the crowd.  That's when that

24   rugby scrum breaks up, Mr. Epps moves away, He approaches the

25   line.  This is one of Mr. Ungvarsky exhibits.  And then

1   Mr. Epps has the conversation with the officer.  There's no

2   mystery what he says, it's recorded in the body-worn camera of

3   that officer from the other angle.

4          Mr. Epps essentially tries to negotiate, "Hey, can we

5   stand here, but not here?  If we're below these steps, is that

6   okay, if we maintain some space?"  The officers don't

7   necessarily say, "Sure, that's fine," but it's, like, that's

8   better than charging us.  And that's when Mr. Epps turns around

9   and directs the crowd, try to step back.

10          The next video is -- the one I just showed you is the

11   best angle, the best video we have of this incident.  Limited

12   by the evidence that exists, that's the evidence that exists.

13          The next one is a composite that includes two other

14   angles that provides some context, particularly the timing of

15   just how soon after Mr. Epps' reach or touch of the sign occurs

16   to when it actually hits the police.  And it's very short in

17   time.

18          This is another one of when Mr. Epps' hands are on

19   the sign or reaching toward it.

20          THE COURTROOM DEPUTY:  It's not coming up.

21          THE COURT:  I don't have it yet, Mr. Gordon.

22          MR. GORDON:  You don't have it?

23          THE COURTROOM DEPUTY:  I can't seem to keep it up at

24   the same time as everybody else.

25          Counsel, can you see the video?

```
1              MR. UNGVARSKY:  I can see the video.

2              THE COURTROOM DEPUTY:  Judge, can you see?

3              THE COURT:  It's not on my screen.

4              THE COURTROOM DEPUTY:  It's not on your screen

5       either?

6              (Pause.)

7              THE COURTROOM DEPUTY:  Press play, Counsel.

8              MR. GORDON:  Sure.

9              THE COURTROOM DEPUTY:  Nothing yet, Judge?

10             THE COURT:  No.

11        I think you can just play it.  Mr. Ungvarsky has seen

12      it, I'm sure, numerous times.  I think he's pretty well

13      acquainted with it.  If it works by just showing it to me.

14             (Video played.)

15             MR. GORDON:  And you've seen the rest from there,

16      Your Honor.  The, sort of, weight of the sign and the force

17      which it was thrust is hard to appreciate from that aerial

18      view.  So this last video is very brief, it just shows the

19      moment of impact with the officers.

20             (Video played.)

21        You can see that the officers struggled to deal with

22      the sign.  You can see the impact it had on them.  You can see

23      the size of it.  You can see the fighting that took place in

24      its wake and the crowd surge forward afterwards, only to be

25      repelled when the officers used pepper spray.
```

1          If we can go back to Ms. Hayman's presentation.

2          And, Ms. Hayman, if we can go to slide No. 19.

3          That's a photograph you've seen in the sentencing

4    memorandum of Mr. Epps in the middle of that scrum afterwards.

5          From there, Mr. Epps walks the line on that west

6    front for about a half hour, engaging in those instances of

7    deescalation that I had described previously.  After that, he

8    leaves, goes back towards his hotel, and does have an impromptu

9    interview with another person.  I can't call him a journalist,

10   but another person who is filming and recording people's words.

11         Mr. Epps gave that interview.  It's about seven

12   minutes long.  I'm only going to play the first five minutes.

13         THE COURT:  He never went beyond -- he never went

14   further toward the Capitol than he's seen in these videos?

15         MR. GORDON:  That's correct, Your Honor.  He never --

16   if you think of those three steps that separate the lowest

17   level of the west plaza from the next, he never went up those

18   three steps, other than a brief period of time.  If he's to be

19   credited -- but, we can't corroborate -- but where he says that

20   he had to render aid to somebody who had suffered from a

21   medical incident.

22         So after that he goes back to this pizza place across

23   from his hotel and talked to the other person and described his

24   own motivation and why he did what he did.  Describes his

25   actions.  Whole thing is about seven minutes.  I'm going to

1    pull the first five minutes for Your Honor and then we're going

2    to talk about, sort of, how this all comes together.

3              This is the last piece of video or evidence that I

4    want to show you about Mr. Epps' conduct.

5              Ms. Bell Norwood, if we can go back to me.

6              I don't have sound for some reason.

7              Let me try it with Ms. Hayman's instead.  There may

8    be an issue showing it with sound to Mr. Ungvarsky.

9              Ms. Hayman, this is going to be slide 21.  If we can

10   play that video.

11             (Video played.)

12             Stop there.  Ms. Hayman, can you stop there.

13             THE COURT:  Why don't we just interrupt for one

14   second.

15             So, the sentencing that's set for 11, we're running a

16   little bit late.  So we'll shoot for 11:30.  But we won't do it

17   before then.  Okay.  Thanks.

18             MR. GORDON:  I'm very close to being done, Your

19   Honor.

20             THE COURT:  Okay.  Thanks.

21             MR. GORDON:  The two key points he makes in this

22   statement, the first is, well, it was Antifa who were the

23   violent ones.  How did he know they were antifa?  Oh, he didn't

24   know, but we're not violent, so it must have been antifa.

25             In this Mr. Epps is doing the exact same thing, the

1    exact same thing that he, himself, has been the victim of this

2    conspiracy theory.  He made this point in his video on January

3    6, he made it to the FBI when he called in on January 8th.  He

4    made it to Congress a year later when he was interviewed on

5    January 21st, 2022.  Antifa is responsible.  How do you know

6    they were Antifa?  Well, I didn't know, it must have been them

7    because they're the only ones that would do this.  And the same

8    with the others who are eager to point the finger at the

9    government for January 6th, he is eager to point the finger at

10   others.  He may have changed his tune today, but that is, you

11   know, an aggravating factor.

12          The second point that matters here is what he said at

13   the end, "They needed to know."  "They" being Congress.  "They

14   needed to know how angry we were."  And not by being, you know,

15   at the Ellipse.  He knew about that.  That wasn't sufficient

16   for Mr. Epps.  Congress needed to know because he and thousands

17   of others needed to go into the Capitol, into the Rotunda, and

18   tell them, essentially face-to-face, en masse.  He's explaining

19   exactly what he did.

20          So reasonable people can look at all this evidence

21   and disagree about whether it merits a misdemeanor or a felony

22   charge.  If a felony, whether it raises to a 1512 or doesn't,

23   whether the barricade break and the sign push resonate or meet

24   the elements of 231.  Reasonable people can disagree whether

25   the right result is a felony with a relatively light sentence

 1    for a felony, or a misdemeanor with a relatively stiff sentence

 2    for a misdemeanor.

 3          Whenever I do presentations to the high school

 4    students, I always emphasize -- this sounds corny, but I always

 5    emphasize that we are the Department of Justice, not the

 6    Department of Convictions.  And so as the Department --

 7          MR. UNGVARSKY:  I'm sorry, Mr. Gordon.  I really am

 8    sorry.  Can the exhibit be taken down so I can see you?

 9          MR. GORDON:  Of course.  I'm sorry.

10          MR. UNGVARSKY:  I'm sorry, Mr. Gordon.  I apologize.

11          MR. GORDON:  And as the Department of Justice, that

12    means that we have to do what we think is right.  And sometimes

13    we come across a unique and complicated case like this one

14    where that answer may not be obvious.  But here we used our

15    prosecutorial discretion and arrived at the conclusion that the

16    best result in this case was a misdemeanor plea with a

17    relatively stiff sentence for a misdemeanor.

18          This is aggravated conduct in the realm of

19    misdemeanors in January 6 cases and it deserves an appropriate

20    sentence commensurate with that.

21          All that being said, I expect there's a lot that

22    Mr. Ungvarsky is about to say that I'm going to agree with

23    about the mitigating factors in Mr. Epps' favor, particularly

24    his efforts to de-escalate the conflict on multiple occasions,

25    and the fact that he was the victim of this widespread

1    conspiracy theory that is both false and continuing to be

2    promoted by many.

3            So, the last thing I want to say Your Honor is this:

4    He has already received a substantial benefit for all that

5    mitigating conduct.  The government already weighed all that,

6    we already factored that in to give him the significant break

7    of a misdemeanor plea offer, when it's entirely possible that a

8    grand jury could have indicted him on a felony.

9            So if Your Honor then goes and again uses that same

10   mitigation to ratchet his sentence on a misdemeanor far down

11   from what it might otherwise be, it's essentially double

12   counting that benefit.  So the same way I asked --

13   Mr. Ungvarsky is going to ask Your Honor to consider the

14   mitigation factors, I'm going to ask Your Honor to consider the

15   degree to which the government has already incorporated it in

16   the result of this case.

17           In the end, six months is the right sentence for

18   this.  I don't envy the position you're in.

19           THE COURT:  Okay.  Thanks so much, Mr. Gordon.

20           Mr. Ungvarsky.

21           MR. UNGVARSKY:  Your Honor, thank you very much.  I

22   probably -- I will be shorter than Mr. Gordon, but I don't know

23   if we'll be done by 11:30.

24           Your Honor, Ray Epps was in the middle of a crowd, a

25   mob, on January 6th outside the Capitol.  And persons in that

1    situation get stuck with joining the actions of the mob, a

2    group think, a mob mentality.  It can be impossible to break

3    away.  But Ray Epps did break away from the mob mentality.  He

4    was present, yes.  He engaged in disorderly and disruptive

5    conduct, yes.  He admitted that.  But his words and his actions

6    were to try to de-escalate others, to suppress violence.

7           Nobody listened to him.  None of the people there

8    listened to what he said.  But nothing that he did was to cause

9    physical pain -- was to cause physical harm, to add to any

10   violence, his plan was never that and his actions were never

11   that.  It takes character, principle, and integrity to break

12   from the mob.  We saw so many people that day and mobs on other

13   days who failed to do so.

14          But Mr. Epps displayed his character, principle, and

15   integrity when he broke from the mob on January 6th.  He had

16   gone through the early two barriers.  He told others to stop

17   their actions, their violent actions, their threatening

18   actions, their endangering actions, follow the will of the law

19   enforcement officers outside the Capitol.

20          Your Honor already noted that unlike those people who

21   surged there, Mr. Epps didn't.  He didn't go past those steps.

22   He used his -- you know, the government wants to punish him for

23   his voice and his size, but he used his -- and as a large man

24   myself, I wish that weren't a characteristic that would be used

25   against us -- but he used his voice and size to tell others not

1    to confront the officers.  He acted to support the officers.

2          He turned away.  He didn't press forward to the

3    Capitol.  He didn't enter the Capitol.  He left.  And I

4    think -- I have seen video of him providing -- sort of

5    escorting somebody out, providing medical aid to someone.  I

6    think it's on the exhibit that I provided to Your Honor.  I

7    think it's Exhibit 102B maybe.

8          But in any event, he rendered medical aid on his way

9    out, and he left.  And he displayed his character, principle,

10   and integrity when he called the FBI on January 8th to record

11   himself.  And he displayed his character, principle, and

12   integrity when he agreed to speak twice with the House Select

13   Committee, including publicly.

14         Now, when you've been a member of a group, when

15   you've been lied to and long believed one thing, it can be

16   really impossible to break away, your mindset to change.  And

17   especially those of us who are older, like Mr. Epps and I,

18   start to think one thing and we think that's how things are.

19   And, you know, we really couldn't imagine that people who are

20   like him, supporters of the President, could be so angry and

21   violent.

22         But as he and his wife were threatened, especially as

23   those threats escalated around the time of his congressional

24   cooperation, and he really came to a crossroads.  And those

25   threats -- I'm not going to go into it in great detail, it's in

1   the materials.  I mean, people -- you know, there was firearms,

2   you know, brandished at them at their home.  There was spent

3   shell casings in line sight to their home and their bedroom.

4   There were people who pretended to set up visits to potentially

5   use the wedding and special event site that they had, and then

6   they would be along with Mrs. Epps and cause her threat and

7   fear.

8           You know, he really -- he and his wife, in a way,

9   they're almost like (crosses fingers).  They came to a

10  crossroads.  And what he did -- I think this is so admirable,

11  so many people can't do it -- is he broke yet again from group

12  think.  He broke, he concluded that it was -- the Trump

13  supporters, like him, who instigated and were there that day on

14  January 6th -- gosh, he had wished it was someone else, he had

15  wished it was antifa, or whatever, you know, they believed that

16  phrase means.  But he realized it was people who supported the

17  President, like he did, people that had been told the election

18  was stolen, like he had been told.

19          Mr. Epps concluded that the people there violated the

20  Constitution by engaging in violence outside the Capitol and

21  inside.  He concluded that President Trump had lost the

22  election and that President Biden had won the election.  The

23  election was not stolen.  He had been wrong.

24          And he identified -- and you see this in his letter

25  to the Court, and you read this, "The blame of the insurrection

1     is not on the FBI.  It is on those who were at the Capitol,

2     engaged in insurrectionist activities, and those who misled

3     Americans, like myself, into believing that the election had

4     been stolen."

5          You know, when he wrote that letter -- he's a very

6     independent man, with very independent thoughts and desires of

7     expression.  He used the word "of the insurrection," because

8     that's how he sees it.  He talked about violence that was there

9     because that's what he saw.  He recognizes and saw that there

10    was violence and that people engaged in that insurrection

11    against a lawful, correct election result.  He accepted

12    responsibility for his offense, and he feels remorse for his

13    actions that day that contributed to that mob.

14          Now, on the other hand, he's also proud that while he

15    was there, while his presence contributed to that, he tried to

16    de-escalate.  He tried to stop it.  And I don't -- you know,

17    you don't have his experience, I don't think, Your Honor,

18    because you're a judge and people listen to you.  But, you

19    know, you saw that people were not listening to him.  He was

20    called a "boomer."  I don't know whether he's a boomer or not.

21    But I know people don't listen to me anymore.  And I've learned

22    to keep my mouth shut when around my kids and their friends.

23          And Baked Alaska and that group of people on January

24    5th, they didn't listen to him.  And that wasn't a large mob he

25    was talking to, it was a group.  And he said there, that day,

1   peaceful, peaceful, peaceful, peaceful because that's what he

2   wanted.  He didn't talk about violence, he didn't talk about

3   storming, he didn't talk about intimidating Congress, as the

4   government said, to certify the election.  He didn't say any of

5   that at all.  He just said they should go down to the Capitol

6   and express their view.

7        He wasn't listened to by Ryan Samsel when he said,

8   "Calm down.  Stop.  They're doing their job, hold back."  They

9   didn't listen to him.  Those people didn't listen to him.  And

10  the people, when they got to the Capitol steps, didn't listen

11  to him.  Nobody listened to him as he tried to de-escalate.

12  But that's what he did try to do.

13       I really -- as I listened to the government talk

14  about the quote/unquote offense conduct, and as I talk about it

15  here, I think it's an expansion over the statement of the

16  offense.  I think it's important that he never talked about

17  intimidating Congress.  In fact, even in that post video

18  interview by the citizen journalist, if you will, he talked

19  about -- the word he used was it is symbolic.  The presence

20  outside the Capitol was symbolic.  Not designed to intimidate.

21  It had symbolic value.  And as thought that day, the election

22  had been stolen and what happened was wrong.  It was an

23  amplification of a voice from the President's Stop the Steal

24  rally and an amplification of what is from prior events.

25  Symbolic amplification of voice.

1          He didn't contribute to multiple instances of

2     violence against police officers.  There's no indication that

3     he knew that an officer had fallen to the ground when Ryan

4     Samsel and the others went through there.  There's no

5     indication of that, or that his -- his hands weren't on the

6     gate.  He wasn't the one who pushed through.  He was trying to

7     have people not do that.  He was behind all that.

8          If he contributed, it's contributing in the sense

9     that he was physically there.  His hands -- they talked about

10    building the size of the mob.  We already talked, nobody

11    listened to him on January 5th.  And he didn't say anything at

12    all on January 5th.  And it wasn't in his mindset that this day

13    was about 1776.  He's never talked that day about 1776.

14    Somebody else said that, not Mr. Epps.  He didn't agree with

15    it.

16          By the way, unlike so many of these cases, there's

17    no, you know, prior social media or even private text messages

18    or anything by Mr. Epps talking about wanting -- you know,

19    prevent the certification of the election, overturn the

20    election.  Just speak out about the result, but not overturn

21    it, attack it.  Certify it.  There's nothing about violence.

22    And we see that in so many other cases.

23          And there's nothing afterward because that wasn't his

24    mindset.  And what he said on the street was protected speech.

25    And there were a lot of people going to the Capitol to register

1    their voice.  I'll be honest, I was in D.C. that day and there

2    wasn't a moment's thought in my mind I would go anywhere near

3    that Capitol that day.  But he was there, as were others, to

4    register a voice.

5           Samsel, we already talked about how there's no

6    indication that person listened to him.  He's not leading the

7    way to others to follow him.  Others led the way and he

8    followed.  Should he have followed?  No.  Did he think that,

9    like, he would be like able to calm people down?  That's what

10   he said and there's no indication that what he has said isn't

11   true.

12          You know, like a lot of people of my generation, a

13   slightly older generation, we think people will listen to us

14   and we think things can be the way we think it should be.  But

15   it's not necessarily going to be that way.

16          With the Trump sign, it did go over his head --

17          THE COURT:  Maybe I should interrupt, Mr. Ungvarsky.

18   I think there's arguments in the defense memo regarding his

19   belief that the Capitol would be open on January 6th and

20   statements, therefore, he didn't -- wasn't doing anything

21   illegal.  But if that's still your contention, then why would

22   he be saying, "I will probably going to jail for that."  So can

23   you square that for me?

24          MR. UNGVARSKY:  The way I'd square it, Your Honor, is

25   that I think that some people who are supporters of President

1     Trump thought that they would be targets by, you know -- that

2     their viewpoint wasn't supported by those in authority and that

3     they ran some risk.

4              THE COURT:  Okay.

5              MR. UNGVARSKY:  I think that he thought on, January

6     5th, that it would be open.  I think he knew by January 6th,

7     when he was -- that it was not.

8              THE COURT:  Okay.  Thanks.  I agree that the sign and

9     the push seem somewhat equivocal of the evidence.  I think the

10    video is somewhat equivocal on that, as you pointed out.  But,

11    I think that's where you were going next.

12             MR. UNGVARSKY:  Thank you, Your Honor.  I may have

13    misunderstood the government's position in its filing.  So what

14    I see here, it seems to me that the government has conceded

15    that.  You know, when they say that reasonable people can look

16    at the video as to whether Mr. Epps' hands were actually on it

17    or not on it or this or that, to me that's sort of a concession

18    because it really undercuts the contention that he physically

19    caused that sign -- he physically pushed that sign to go in any

20    certain direction.

21             I think the same with the scrum that was happening.

22    I see it more as a scrum.  If you look at the video, he was in

23    the midst of a large, tight crowd.  I mean, I haven't been at

24    one of those since -- well, I haven't been in such a large,

25    tight crowd since I saw Phish when I was in my late 20s.  I --

1     I know, no one else in this courtroom would have gone to see

2     Phish, certainly not Mr. Epps.  But when we -- when you're in

3     that large, tight crowd -- you can see in that video, he's

4     being pushed from behind.  He's not pushing, like a rugby

5     person.  And then you can see in the video that we sent, he

6     tries to maneuver to try to get himself out of there.  And he

7     tries to walk upstream and he has a hard time getting upstream.

8     And I think, because of his size, ultimately he's able to.

9           I don't think he contributed to that sign being, you

10    know, pushed to the police.  I think that's -- I think that's

11    argument.  And maybe it's fair argument by the government, but

12    I think it's excessive.

13          And so -- and he talked about his motivations.  So --

14    and I -- and it's very important, on January 6th, that there's

15    no -- that in that interview, he wasn't talking about going

16    into the Capitol in that interview after the events, he was

17    talking about being outside the Capitol.  And I think the

18    reason why I'm saying that's important, I think the government

19    blurs, they blur what he says on the 5th about going inside

20    with what they say on -- with what he says on the 6th, which is

21    about all the people were there on the outside.

22          But he doesn't -- like, we don't have a situation

23    here where he's telling people no, you should break in, you

24    should force in, you should breach, you know, or whatever the

25    words are.

1          And, so, you know, that's -- so I think his offense

2     conduct, I think it makes out the offense, which is why he pled

3     guilty to this offense.  And this is the offense he's before

4     the Court for and I -- gosh, I haven't had this since I did

5     Capitol murder cases, where the government somehow said we've

6     been, like, already generous in giving a plea, when you

7     wouldn't have accepted -- you would have gone to trial on

8     anything else, so you don't get any sentencing mitigation for

9     all the good -- all the good that we see in you and all the

10    pain that you -- that you -- that was incurred by you for what

11    you did.

12          I mean, I -- I'm actually kind -- I'm bothered by the

13    government's argument that somehow or another their plea offer

14    is what he -- is good enough.  This is -- this is what they

15    agreed to.

16          And so now it takes me to my request for the

17    sentence, which is a sentence of probation.  And I acknowledge

18    that the government tends not to recommend probation unless

19    it's, like, a parading case.  And as the government said

20    earlier today, but courts give probation on the misdemeanors,

21    including not just a parading cases.  And we gave four examples

22    in our sentencing memo.  And I think then the government gave

23    yet a fifth example in its sentencing memo.  And I think

24    that --

25          (Mr. Ungvarsky's video froze.)

1            MR. UNGVARSKY:  So we do ask for probation.  Mr. Epps

2      is -- I'm going to make this very clear to Your Honor:  He and

3      his wife feel threatened.  They feel that as their address,

4      their home becomes known, that they are in danger.  They feel

5      that way because of messages that they continue to receive.

6      They feel that way because they've been told by the FBI that

7      there were threats on their lives.

8            And while they're trying to live in a trailer in

9      hiding in the woods, there's been, you know, there's been some

10     identification of their location.  And so as a man who's owned

11     a gun for his whole life, he would like to have a gun in the

12     house as protection.  He would like that.

13            On the other hand, he recognizes the countervailing

14     concerns about someone who is on community supervision having a

15     firearm.  And he fully consents to a gun restriction in this

16     case.

17            He does ask, in terms of travel, that if the Court is

18     going to limit his travel -- that he be permitted to travel.

19     But most definitely he needs to be able to travel to the

20     District of Delaware, Federal District of Delaware, because he

21     has a pending civil case there where he's a party.  So we ask

22     that.

23            If the Court is inclined to include, for part of the

24     period of probation, a period of home confinement -- which I

25     don't think is necessary, I think it's more than -- than

1    required by the statute.  I ask that, instead, what the Court

2    do is have him on the GPS with a curfew of 10 p.m. to 5 a.m.

3    His wife is -- his wife -- you know, he and his wife are what

4    some people would say are elderly.  He has physical concerns,

5    he has emotional and mental concerns.

6          You know, he wants to be able to go and not, you

7    know -- you know, there's snow where he is, and there's a lot

8    of snow where he is, and it's hard to get out from where they

9    are.  And he doesn't want her to be the one who has to go do

10   the grocery shopping and the medical appointments without him.

11   And the propane.  And he wants to be able to help.  And we've

12   seen during pretrial that he has followed all the conditions of

13   pretrial, 100 percent.

14         Now, Mr. Epps, Your Honor, in support of his

15   probationary sentence, he has no criminal record at the age of

16   62.  In 2021 the government viewed videos, they viewed other

17   evidence, and they decided not to charge him for any offense at

18   all.  Now, nobody knew that, other than the government, until I

19   saw it, you know, buried amist of discovery.  But then came

20   the, you know, the misdemeanor and he agreed, because he did

21   commit this misdemeanor.

22         He helped law enforcement on multiple occasions that

23   day.  He's a person who -- and I know you've heard this so many

24   times, but I think he thoroughly -- he demonstrated it, his

25   great respect for law enforcement.

1          I thought telling of the government was this line:

2     The government's not aware of any other case of a defendant, a

3     January 6 defendant, who took such actions trying to tamp down

4     the energy and the actions of the crowd.  They couldn't think

5     of any other case.

6          I also can't think of any other case of which I'm

7     aware in which the government formally said -- or, internally

8     at least -- that they weren't going to charge somebody and then

9     later -- later came with charges.

10         THE COURT:  I think there are certainly cases where

11    the government has found other video or other evidence that has

12    given them a reason to charge.  So that, to me, is less

13    convincing.

14         MR. UNGVARSKY:  All right.  He's willing to help law

15    enforcement because I think by nature he's a helper.  You see

16    that -- we've talked about his relations with his wife, and you

17    see that in the letters.  You see that as someone who would

18    go -- would go find homeless people, and not one or two, but

19    scores of them in November and December when they were living

20    in Arizona, in Mesa, Arizona.  He would go to Pioneer Park to

21    invite people to his home for Christmas, to give them Christmas

22    breakfast -- or lunch, I forget what it is -- and for gifts.

23    For years, almost ten years he did that.

24         What I found so telling about that was in 1993, '94,

25    I think at around the same time, I was living right by Mesa,

1   Arizona and I was going to Pioneer Park and I was interacting

2   with the people who were unhoused at that time.  So I find it

3   interesting, he and I had this overlap, you know.  But you know

4   what I didn't do?  I didn't invite anybody into my home.  You

5   know, I did -- you know, I was sort of arms length in my care

6   and concern for those people in need.  And he brought them into

7   his home.

8           You see how he helps travelers.  You know, if someone

9   is broken down on the side of the road, you know, someone

10  needed -- you know, someone's kids -- they're impoverished and

11  their kids -- they didn't have money, somebody needed a ride

12  for hours to another state.  You know, he just dropped

13  everything and he volunteered.  And, you know, for neighbors,

14  you know, he's a -- for neighbors he would help make home

15  repairs, roofing and other home repairs.

16          As the Court fashions a sentence that reflects the

17  seriousness of the offense and promotes respect for the law --

18  well, first of all, I'll just do deterrence.  I think a

19  sentence of probation satisfies deterrence.  You're never going

20  to see Mr. Epps commit a crime again.  I think you know that

21  and the government knows that.  And you're going to -- I think

22  you also have general deterrence from the fact that, you know,

23  notwithstanding all the vitriol (sic) that he speaks and

24  notwithstanding his attempts to tamp down the crowd, the

25  government has still charged -- a message has been sent by the

1    government, by the charge, by the conviction.  And a

2    probationary sentence will reflect the seriousness of the

3    offense and promote respect for the law, and I ask the Court to

4    so impose.

5            THE COURT:  Thank you very much, Mr. Ungvarsky.

6            Mr. Epps, I've read your letter.  I am happy to hear

7    anything else you would like to say.

8            THE DEFENDANT:  Thank you, Your Honor.  Good morning,

9    Your Honor.

10           It is a privilege to be a citizen of the

11   United States of America.  I love our Constitution and this

12   beautiful country in which we live.  Trusted elected officials

13   and Fox News led to my guilt -- gullibility in believing the

14   election was stolen.  This resulted in my trip to D.C. to be

15   with my son for the January 6th protest -- excuse me, Your

16   Honor.  I'm a little nervous.

17           THE COURT:  Take your time.

18           THE DEFENDANT:  And in going from President Trump's

19   rally to the Capitol.  I regret both those decisions.  I was

20   wrong when I knowingly trespassed and engaged in disorderly

21   conduct on the restricted grounds of the United States Capitol.

22   I shouldn't have been there.  In hindsight, I realize that's

23   not what a constitutional-loving America should have done.

24           What I witnessed the night before and that day was

25   rage in a vulgarian level that I have never seen before.  The

1  crowd and its energy and the violence were not generated by the

2  FBI or antifa.  It was generated by people like me, who

3  supported President Trump and listened to his lies and the lies

4  of others that the election was stolen.

5         The election was not stolen.  President Joe Biden won

6  the election.  Robin and I have come to realize that.

7  Unfortunately, my wife and I continue to experience that rage

8  and vulgarity shown on January 6 from those that still refuse

9  to accept the truth.

10        When I realized what I thought would be a peaceful

11  protest turned violent, I did my best to help law enforcement

12  and calm others.  After, when I got home, I continued to try to

13  do the right thing.  When Fox News and the Trump cult turned on

14  me and my wife for a convenient shift of blame, it was life

15  changing, it was a life-changing reality check.  My wife and I

16  were forced to look elsewhere for the truth.

17        I have learned that truth is not always found in the

18  places I used to trust, but in God, my faith in God, in our

19  Constitution and those who abide by it, like the police

20  officers who were there that day, the judges of this court and

21  my lawyer.

22        I always choose God, our Constitution and truth over

23  politics or a politician.  I ask for this Court's mercy.  I

24  want to use the rest of my life to inspire others to recognize

25  and learn the truth of election results and obey the laws of

1     our great country, even if they may not agree with them.  Thank

2     you, Your Honor.

3              THE COURT:  All right.  Thank you very much,

4     Mr. Epps.

5              As Mr. Gordon said in the beginning of his

6     presentation, this certainly is a difficult sentencing.  And

7     the lawyers have very articulately and cleanly argued their

8     cases and brought each positive inference for each side out of

9     it.  I also appreciate the fact that the government has been

10    balanced in its presentation, explaining and conceding the

11    mitigating factors where appropriate.  Certainly I don't -- the

12    defense's job isn't to do that.  The defense's job is to

13    advocate for the defendant, and Mr. Ungvarsky has certainly

14    done that ably and fairly, and I appreciate that as well.

15             I don't think there's any dispute on the guidelines,

16    which were zero to six months.  There is a dispute about 4C1.1.

17    But whether that's applied or not does not affect my sentence

18    in this case.

19             I'm very familiar with the 3553(a) factors.  So as we

20    look at the defendant's behavior on that day, as I said

21    earlier, I do find the evidence regarding the sign and the

22    scrum somewhat equivocal.  And Mr. Gordon, I think, has argued

23    the best inferences against defendant, and Mr. Ungvarsky for

24    the most favorable ones.  I think anyone for whom a heavy sign

25    passes is likely to raise their hands to protect themselves.

1    The sign is also moving laterally, parallel to the police line,

2    rather than in front of the police -- rather than towards the

3    police line when Mr. Epps initially has his hands up.  It's

4    awful hard to say whether his pointing is an instruction to

5    push the sign towards the officers or not.

6           Similarly, the scrum, it's unclear whether he's

7    caught in that scrum -- which he unequivocally disengages from

8    rapidly -- or whether he has any intent to join in pushing

9    forward.  So I think those both are really too weak to dictate

10   the appropriate sentence here.

11          So what we're left with is still certainly concerning

12   behavior.  Whether Mr. Ungvarsky is right that people were

13   listening to Mr. Epps or not, the question is what statements

14   did he make and what was he intending to influence people.  I

15   think on January 5th, that he is saying that we will go into

16   the Capitol, and he mentions that he's probably going to jail.

17   And so either that means he realizes it's unlawful then, which

18   is I think the most natural position, or Mr. Ungvarsky's

19   interpretation I think is possible, but perhaps less likely.

20   Again, if he thought the Capitol was open, why would he go to

21   jail for entering it?

22          But it's certainly true that to say he was a leader

23   on January 5th and inspiring lots of people is a vast

24   overstatement, that there are only a few people around him,

25   they certainly seem to be discounting what he's saying.  There

1    are lots of people saying lots of things out there.  And so I

2    think that it is an indication of his mindset, but it's

3    certainly not a basis to conclude that he's some ringleader.

4         The most damning activities he takes are on January

5    6th; that he's early at the Peace Circle, and at that point he

6    can certainly see that the Capitol is not open, that people are

7    not welcome there.  I think this is a point Mr. Gordon

8    stressed, that, Mr. Epps, you certainly knew at that point that

9    to go further would be to break the law.  And you did not lead

10   that group, you did not push over any bike racks or barricades.

11        But as the government says, you willingly went

12   forward once those barricades were broken down.  And you were

13   one of the earliest members of that group to go forward.  And

14   that is serious, as the government points out.  The mob only

15   achieves its goals because it's able to proceed further toward

16   and then into the Capitol.

17        So the first barricade was down, but you did not turn

18   back, but went on to the next.  And the next barricade, again,

19   seeing where the police line was thicker, was more reinforced,

20   you were closer to the Capitol, but once again, you didn't say,

21   "We shouldn't be here.  This is wrong.  I've made my point, I'm

22   leaving."  You remained there and engaged with others.  You

23   were near the front now, once that line is breached.  You do

24   not enter.  And, in fact, then you do turn back.

25        And, so, for the conduct that I've just mentioned, to

1       me some jail is appropriate.  And whether it's what the

2       government asks for or less is an interesting question.

3               So, stacked against that is your mitigating conduct.

4       And even the government notes that that conduct was mitigating

5       on January 5th and 6th.  You did emphasize "peacefully" on

6       January 5th.  There was no social media posting beforehand

7       about tearing this House down or hanging Mike Pence or Congress

8       being traitors.  And then on January 6th you did deescalate the

9       situation, at least five times according to them, and even on

10      the video we see you telling people to come up and no farther.

11      So that's certainly mitigating behavior.

12              I think, more important, was what happened after

13      January 6th, that you turned yourself in on January 6th -- on

14      January 8th, willingly and voluntarily, and you then gave

15      voluntary and consensual interviews to law enforcement and the

16      January 6th Committee, in which you testified and cooperated

17      truthfully.

18              And for your cooperation and conduct, you have been

19      vilified and threatened in a way unique to January 6

20      defendants.  You were hounded out of your home, you were

21      hounded out of your town, and you've had to live like a

22      fugitive because of lies that others spread.  There are plenty

23      of January 6 defendants who suffered scorn and disdain in their

24      communities for what they did that day.

25              But you seem to me, so far, the only one to have

1    suffered, and to a much greater degree, for what you didn't do.

2    In other words, there are plenty of conspiracy theorists still

3    who refuse to believe that this was an insurrection by

4    supporters of the former President and not some violent act

5    instigated by antifa or the FBI.

6         So, there have been more than 700 people convicted so

7    far in this courthouse of crimes related to January 6th.  Not

8    one is a member of antifa or an FBI agent.  So what you've been

9    through because of lies is truly unfortunate.

10        I've also read all of the letters in support, your

11   own statements.  I believe you are truly remorseful for your

12   conduct.  And not remorseful because you were caught, but

13   remorseful starting early on in this process.

14        I also believe that you've led a very positive life

15   of service in your community.  Mr. Ungvarsky touches upon a few

16   of them, but the letters, which are lengthy and numerous, speak

17   in great detail of the service you've rendered.  And, really,

18   none talk about your service in the Marine Corps, but your

19   contributions to your family, your community, and your town

20   with many good works over a long period of time.

21        Given all of that mitigation, I ultimately believe --

22   and it's a difficult decision -- that prison is not warranted

23   in this case and that a probationary sentence is appropriate.

24   Again, as I've said, everything the government said and

25   everything it requested were reasonable.  This is not an easy

1    sentencing, and I believe this is the appropriate one.

2            I will not enforce a travel restriction or home

3    confinement because I just don't think those serve any purpose

4    at this point.  But I will impose a gun restriction, as I've

5    imposed on all supervisees from January 6.  And I know that

6    there are reasons that Mr. Ungvarsky has stated that I should

7    permit it, here but I will not.

8            So I sentence the defendant to a term of 12 months of

9    probation on Count 1 and a special assessment of $25.  I will

10   not impose any travel restriction.  There will be a gun

11   restriction.

12           I'm also going to require 100 hours of community

13   service, Mr. Epps, along the lines that you, yourself, have

14   just proposed in your allocution.

15           You shall abide by the following mandatory

16   conditions, as well as all discretionary conditions recommended

17   by the probation office in Part D of the presentence report,

18   including not committing federal, state, and local crimes.  I

19   will not impose any drug testing requirement.

20           I will order $500 in restitution, and that will be

21   due within 60 days.

22           You may appeal this conviction if you believe your

23   guilty plea was somehow unlawful or involuntary, if there was

24   some other defect in your plea agreement.  You also may seek

25   relief from the Court if you believe you've been rendered

1    ineffective assistance of counsel in relation to the plea or

2    sentencing and if new -- I'm sorry, or if new or currently

3    unavailable information became available to you.  You must file

4    such appeal within 14 days after the entry of judgment.  If you

5    are unable to afford the cost of appeal, you may request

6    permission from the Court to file without cost and you may also

7    seek court-appointed counsel.

8             Do you understand all of that, Mr. Epps?

9             THE DEFENDANT:  Yes, sir.

10            THE COURT:  Are there any objections to the sentence

11   imposed not already noted on the record, Mr. Gordon?

12            MR. GORDON:  No, Your Honor.  Thank you.

13            THE COURT:  Mr. Ungvarsky?

14            MR. UNGVARSKY:  No, Your Honor.

15            THE COURT:  All right.  Again, Mr. Epps, good luck to

16   you.  I hope that you are able to continue your contributions

17   to your community without continued threat of violence.

18            Thank you very much.

19                          *   *   *

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, JANICE DICKMAN, do hereby certify that the above and

4    foregoing constitutes a true and accurate transcript of my

5    stenographic notes and is a full, true and complete transcript

6    of the proceedings to the best of my ability.

7                         Dated this 19th day of January, 2024

8

9

10                        _____

11                        Janice E. Dickman, CRR, CMR, CCR
                          Official Court Reporter
12                        Room 6523
                          333 Constitution Avenue, N.W.
13                        Washington, D.C.  20001

14

15

16

17

18

19

20

21

22

23

24

25